UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**KURTIS L. BELLAMY**,

Debtor.

Case No. **13-60391-13**

# MEMORANDUM of DECISION

At Butte in said District this 19th day of November, 2013.

In this Chapter 13 bankruptcy, after due notice, a hearing was held November 12, 2013, in Billings on: (1) confirmation of Debtor's Chapter 13 Plan dated September 4, 2013; (2) Debtor's Objection to Proof of Claim No. 1 filed by Altana Federal Credit Union; and (3) Debtor's Motion to Void Lien Under 11 U.S.C. 506(a)(1). Craig D. Martinson of Billings, Montana appeared at the hearing on behalf of the Debtor, and Thomas R. Martin of Billings, Montana appeared at the hearing on behalf of Altana Federal Credit Union ("Altana"). Kurtis Bellamy, Richard B. Baker, Royal Caraveau, and Wendi Bruner testified. Debtor's Exhibits 1, 2A through 2Z, 3, 4 and 5, and Altana's Exhibits A and D were admitted into evidence. Admission of Altana's Exhibit C was denied.

BACKGROUND

Debtor filed a voluntary Chapter 7 bankruptcy petition on March 27, 2013. On Schedule A, Debtor lists his home, valued at $100,000. First Interstate Bank loaned Debtor and his spouse

$166,583.00 to purchase the home in 2005.  The loan from First Interstate Bank is secured by a Deed of Trust dated December 27, 2005.  Wells Fargo Bank has that account now and as reflected in a reaffirmation agreement filed May 17, 2013, and approved May 20, 2013, was owed $160,657.40 as of March 27, 2013.  Debtor filed a declaration of homestead on January 14, 2009.

Altana holds a consensual lien on Debtor's residence stemming from a $40,624.00 home equity loan Debtor and his spouse obtained from Summit Credit Union (now Altana), which loan was secured by a Trust Indenture under the Small Tract Financing Act.  As reflected in Proof of Claim No. 1, Altana asserts it was owed $68,596.50 on Debtor's petition date.

Debtor objects to Altana's Proof of Claim No. 1 and seeks to avoid its lien against Debtor's home, arguing Altana's claim is wholly unsecured.  Altana counters that the value of Debtor's home is something more than $100,000, that a portion of its claim is secured and that the protections of 11 U.S.C. § 1322(b)(2) apply.

Debtor testified that his home was completely destroyed by fire in December of 2008.  With the insurance proceeds of $135,000, Debtor has rebuilt the home, but testified the home is not yet finished.  Debtor presently lives in the home, which has one finished bathroom and two finished bedrooms.  Debtor's home does not have an operational central heating or cooling system.  Debtor is using electric and gas heaters to heat his home.  Debtor believes his home is worth about $110,000 as is, and that based upon estimates, it would cost another $80,000 to finish the home.  Of the amount Debtor estimates it will cost to finish his home, $25,000 is attributable to the heating and cooling system.

Debtor retained Richard Baker ("Baker") to appraise his home.  Baker testified that he

has been a general real estate appraiser for 40 years and performs 600 to 700 appraisals per year. Baker's qualifications stem from his "many years of experience." Baker physically inspected Debtor's home and took pictures, and noted that many items in the home are unfinished. Baker testified that about one-half of Debtor's home is finished and that it would take an additional $80,000 of work to finish Debtor's home completely. Consistent with the foregoing, Baker's appraisal provides in the additional comments section:

> Average quality the home is average quality with 2x6 average homes and average ranges with average replacement costs new of improvements. The home have is the color scheme warm earthtone with inside and outside with color schemes. The homes has tough time with all components and no carpets, no grand cayman heating or cooling, tremendous interior trimwork, not decking, no patio and the brick work on the side of the housing. The resulting tile working on in the bath room have being in work needing replace. The indicating cost would over the with in the painting.
>
> 1) All site working to the Grand Cayman heating and cooling system $15,000 ti $22,000 in considerable size and shapes ranges.
> 2) All have been lower and upper values in carpeting $20,000 to $22,000
> 3) All in the 12 x 24 decking from the replaced in the $9,000 to $10,000.
> 4) All of the tremendous site trimming needed in the $10,000 to $12,000.
> 5) all bring siding the replaces in needed $8,000.
> 6) the cleaning a debris and cleanup work needing $2,000.
> Total Cost New of new components = $80,000[1]

See Debtor's Exhibit 1 and Altana's Exhibit E (reproduced as it appears in Baker's appraisal). Baker testified that his appraiser's license qualified him to give estimates of what it would costs to finish Debtor's home.

Baker used comparable sales to reach his opinion of value. The comparable sales identified in Baker's appraisal are identified as ranging from 29 to 39 years of age. While Baker

---

[1] The Court would note that the total of the numbers provided by Baker ranges from $64,000 to $76,000.

testified that Debtor's home is three years old and identified the "actual age" of Debtor's home in his appraisal as "0," Baker did not use newer homes for comparable sales in his appraisal, explaining "I have nothing to compare." Baker testified there were no homes in the 0 to 9 years of age range in the comparable neighborhood, even though his appraisal states that "the market condition suggest strong demand for the subject evidenced by the number of new homes in the surrounding conforming condition." Baker explained that his comparable sales were probably closest to the neighborhood with 2 by 6 construction. Baker said he could not "build brand new houses on Skyview." With regard to the older comparable sales, Baker apologized that he had no adjustments for comparable sale number 1, explaining there should have been a $12,000 adjustment based upon an adjustment of $1,000 to $1,200 per year for the age of the 36-year-old home. For comparable sales 2, 3, 4 and 5, Baker made age adjustments of $15,500, $18,000, $18,500 and $24,500 for homes that were 36, 36, 29 and 39 years old, respectively.

     Baker also noted that his adjustments for the bathrooms were erroneous, explaining additional bathrooms in a home add additional value of about $1,000 per bathroom. Because Debtor's home has two bathrooms and comparable sale number 1 had only a single bathroom, Baker should have included an adjustment for such in his appraisal. In his adjustment for gross living area, Baker used $25.00 per square foot. For example, Debtor's home is listed by Baker as $1,802 square feet while comparable sale number 1 was only 1,136 square feet. Subtracting 1,136 from 1,802 and multiplying that result by $25.00 yields Baker's sole adjustment of $16,650.00 to comparable sale number 1. Baker also testified that his adjustment to comparable sale number 3 of $9,000 for basement and finished rooms below grade related to an attic.

     As for the net and gross adjustments to his comparable sales, Baker testified at one point

that the acceptable range for the gross adjustment was 15% to 25% and that there was no industry standard for net adjustments. Baker then stated the acceptable level for the net adjustment was 15% and the acceptable level for the gross adjustment was 25%. Baker testified that the net adjustment was based strictly on the closeness of the subject property to the comparable property in the context of miles. Interestingly, Baker's comparable sales numbers 4 and 5 are located .10 miles and 2.33 miles respectively from the subject property. Baker's appraisal assigned a 19.0% net adjustment to comparable number 4 and a 19.2% net adjustment to comparable sale number 5. Comparable sale number 1, which is 1.1 miles from Debtor's home, had an 8.5% net adjustment.

In the sales comparison section of his appraisal, Baker identified 22 comparable properties offered for sale in the subject neighborhood ranging in price from $135,000 to $225,000. Baker's appraisal also identifies 22 comparable sales in the subject neighborhood that were sold in the prior 12 months at prices ranging from $135,000 to $225,000. Baker testified that the 22 homes currently offered for sale were the same as the 22 homes sold, but had no idea how a house could be both offered for sale and sold at the same time. Baker appraised Debtor's home at $135,000 as is, and concluded Debtor's home would be worth $210,000 if finished.

Baker did not use the cost approach to complete his appraisal. However, Baker's appraisal lists the value of Debtor's home under the cost approach as $214,900.[2] Baker

---

[2] While Baker claims he did not use the cost approach, Baker indicates in the appraisal that he assigned a value of $50,000 to Debtor's lot. Baker then plugged in the size of Debtor's home, using 1,802 square feet for the above-grade living space at a cost of $110.00 per square foot and 1,014 square feet for the basement at a cost of $10.00 per square foot. To the foregoing, Baker added $15,000 for appliances, sprinklers, RV pad and decking, $11,520 for a 576 square foot garage and $10,000 for landscaping, driveway and fence. From the forgoing, Baker subtracted $80,000 for depreciation, but then indicates "no functional obsolescence" and "no

explained that his cost approach number should be disregarded, that he used that number as a starting point in Marshall & Swift, and that the appraisal was "as complete." Baker testified that he "did not use the cost approach, period."

Wendi Bruner ("Bruner") is a residential appraiser who performs approximately 300 appraisals per year. Altana commissioned Bruner to perform an appraisal of Debtor's home in July of 2013. Bruner visited Debtor's home on July 2, 2013, and testified that Debtor's home was rebuilt with contemporary design and appeal, and the quality of the home was average to good. Bruner testified that Debtor has rebuilt his home with in floor heating, including a $10,000 boiler that is not typical of similar caliber homes. Bruner characterized Debtor's heating system as an "over -improvement." Bruner completed her appraisal as if Debtor's home had been finished with typical materials. For instance, Bruner's appraisal assumes Debtor's home would have typical heating, such as gas forced air. In completing her appraisal Bruner used comparable sales that were similar in quality, appeal and design to Debtor's home, explaining that Debtor's home is in the process of construction, and thus new.

Bruner testified that the price of homes in Debtor's neighborhood ranged between $180,000 on the low end and $350,000 on the high end. Bruner did not think Debtor's home was a low end or a high end home, but fell in the middle range. Bruner explained that under the sales comparison approach, she uses a method called "bracketing" whereby she looks for comparable sales that are superior to the subject, those that are similar to the subject, and those that are inferior to the subject. For instance, Bruner used six comparable sales of homes ranging in age

---

external obsolescence." If the Court disregarded the $80,000 depreciation number, the cost approach value of Debtor's home, under the numbers used by Baker would be $294,880.

from 0 to 17 years of age. Also, Bruner determined that Debtor's home had 1,782 square feet of gross living area above grade, so Bruner used comparable sales that ranged in size from 1,066 square feet to 1,979 square feet above grade. Bruner's six comparable sales were located between .38 miles and 2.4 miles from Debtor's home. The sales prices of the comparable sales ranged from $234,000 to $265,000. As for adjustments, Bruner testified that the market reaction to bathrooms revealed that an additional full bathroom added a value of $4,000 to a home and a half-bath added a value of $2,000.

Bruner did adjustments to each of the comparable sales. The net adjustments to Bruner's comparable sales ranged between 2.1% and 8.5%, and the gross adjustments ranged between 6.1% and 13%. Bruner testified that the lower the net and gross adjustments, the better the comparable sales. Bruner testified that according to industry standards, appraisers should find better comparable sales if net adjustments exceed 15% or if gross adjustments exceed 25%.

In reaching her opinion of value, Bruner considered the cost approach. Bruner said use of the cost approach was relevant for homes that were under five years old. According to Bruner, the indicated value of Debtor's home under the cost approach (replacement value) was $262,949.[3] Bruner considered the income approach and concluded it was an unreliable indicator of value because most comparable properties were owner occupied. Bruner concluded Debtor's

---

[3] Bruner's cost approach number was based upon numbers Bruner plugged into the Marshall & Swift valuation guide, as adjusted for local building conditions. Bruner assigned a value of $50,000 to Debtor's lot. Bruner also plugged in the size of Debtor's home, using 1,782 square feet for the above-grade living space at a cost of $87.62 per square foot and 1,020 square feet for the basement at a cost of $26.40 per square foot. To the foregoing, Bruner added $16,450 for improvements, $9,432 for a 524 square foot garage and $4,000 for "as-is" value of site improvements. Debtor's home is newly constructed, so Bruner did not deduct anything for depreciation.

7

home, if completed, would sell in 30 to 180 days for a price of $255,000. While Debtor's home is not yet complete, Bruner testified that she could see someone buying the home "as-is" for $180,000, putting $40,000 into the home and then selling it at a profit for $255,000.

## DISCUSSION

The outcome of Debtor's Objection to Proof of Claim No. 1 and Debtor's Motion to Void Lien Under 11 U.S.C. 506(a)(1) is determined by the competing opinions of Debtor and Baker on the one hand, and Bruner on the other. For purposes of valuation, an owner is competent to give his or her opinion on the value of his or her property, most often simply by stating the conclusion without stating a reason. *See* Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL, 2010 ed. § 701:2; *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Tex.*, 614 F.2d 1056, 1061 (5th Cir. 1980). While a debtor's estimate of value may be acceptable in certain cases, the Court may give little weight to an opinion if not based upon sufficient facts. *In re Plummer*, 20 Mont. B.R. 468, 478 (Bankr. D. Mont. 2003); *In re Hungerford*, 19 Mont. B.R. 103, 118-19 (Bankr. D. Mont. 2001). In this case, the Court rejects Debtor and Baker's opinions of value and instead adopts Bruner's opinion of value.

Debtor offered no facts to support his opinion that the as-is value of his home is $110,000. The Court thus rejects Debtor's opinion of value. The Court also rejects Baker's opinion of value. When Altana's counsel questioned Baker about errors in his appraisal and called into question certain aspects of the appraisal, Baker became confused, was unable to answer some questions, and was generally unable to support his appraisal with credible testimony. The facts with respect to Baker's testimony and appraisal, as recited above, demonstrate by themselves why the Court does not accept Baker's opinion of value. The Court

need not belabor the matter.

The Court is thus left with Bruner's opinion of value, which was based on credible testimony and a professionally completed appraisal. Accepting Bruner's opinion that the as if completed value of Debtor's home is $255,000 and subtracting $80,000 for additional work needed to complete Debtor's home[4], the Court concludes that the value of Debtor's home today, as it sits, is $175,000.

Under § 506(a)(1), an allowed claim secured by a lien on the debtor's property "is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1). As recognized by the Ninth Circuit Court of Appeals:

> To put it more simply, a claim such as a mortgage is not a "secured claim" to the extent that it exceeds the value of the property that secures it. Under the Bankruptcy Code, "secured claim" is thus a term of art; not every claim that is secured by a lien on property will be considered a "secured claim."

*Zimmer v. PSB Lending Corp. (In re Zimmer)*, 313 F.3d 1220, 1223 (9th Cir. 2002). *See also*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 239, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (A lien is a "secured claim" under § 506(a) "only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured.")

---

[4] The numbers to complete Debtor's home were speculative at best. Bruner indicated that someone could buy Debtor's home and put $40,000 into finishing the home. Bruner, however, offered no evidence to support such assertion. Similarly, Debtor and Baker contend it might cost $80,000 to finish Debtor's home, yet Baker's appraisal itemizes costs ranging from $64,000 to $76,000. Again, neither Debtor nor Baker offered credible evidence to support their estimates. However, whether the cost to finish the home is $40,000 or $80,000 does not effect the final outcome in this case. Thus, for purposes of its decision, the Court will conclude the cost to finish the home is $80,000.

Debtor owes Wells Fargo Bank $160,657.40 on its first position lien, leaving additional value in Debtor's home of $14,342.60 for Altana's second position lien, which is also, under 11 U.S.C. § 506(a), the amount of Altana's allowed secured claim.  In other words, Altana's claim is partially secured, and partially unsecured, rather than wholly unsecured as argued by Debtor.

Next, the Court must examine the application of § 1322(b)(2), which allows a debtor's Chapter 13 plan to:

> modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. § 1322(b)(2).

Altana's secured claim is secured only by a security interest in Debtor's home.  Under *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 328-32, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), while "[i]t was permissible for [Debtor] to seek a valuation in proposing [his] Chapter 13 plan, since § 506(a) states that 'such value shall be determined ... in conjunction with any hearing ... on a plan affecting such creditor's interest[,]'" Debtor is precluded from modifying the rights of Altana because the anti-modification clause of § 1322(b)(2) protects both the secured and unsecured components of an undersecured lienholder's claim.

Because Debtor is not seeking to value Altana's secured claim, but rather, is seeking to wholly avoid Altana's lien, Debtor's motion to avoid lien under 11 U.S.C. § 506 and objection to claim must be denied.  Additionally, confirmation of Debtor's Chapter 13 Plan dated September 4, 2013, must be denied because it seeks to improperly modify the rights of Altana.

In accordance with the foregoing, the Court will enter a separate order providing as

10

follows:

IT IS ORDERED that confirmation of Debtor's Chapter 13 Plan dated September 4, 2013, is denied; on or before December 4, 2013, Debtor shall file a modified Chapter 13 plan to provide for Altana's claim; and a hearing on confirmation of Debtor's modified Chapter 13 plan shall be held **Tuesday, December 10, 2013, at 10:00 a.m.**, or as soon thereafter as the parties can be heard, in the BIGHORN COURTROOM, 5TH FLOOR ROOM 5503, JAMES F. BATTIN UNITED STATES COURTHOUSE, 2601 2ND AVENUE NORTH, BILLINGS, MONTANA.

IT IS FURTHER ORDERED that Debtor's Objection to Proof of Claim No. 1 filed by Altana Federal Credit Union is overruled; and Debtor's Motion to Void Lien Under 11 U.S.C. 506(a)(1) is denied.

                                                BY THE COURT

                                                */s/ Ralph B. Kirscher*
                                                HON. RALPH B. KIRSCHER
                                                U.S. Bankruptcy Judge
                                                United States Bankruptcy Court
                                                District of Montana